## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| ST. JUDE MEDICAL S.C., INC. *a Minnesota Corporation*, | Civil No. 13-2332 (JRT/JJK) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY** |
| JAMES SAXON and BOSTON SCIENTIFIC CORPORATION, *a Delaware Corporation*, | |
| Defendant. | |

Laurel J. Pugh, Edward F. Fox, Christopher J. Haugen, and Jonathan C. Marquet, **BASSFORD REMELE, PA**, 33 South 6th Street, Suite 3800, Minneapolis, MN 55402, for plaintiff.

Jeannette M. Bazis and John W. Ursu, **GREENE ESPEL PLLP**, 222 South 9th Street, Suite 2200, Minneapolis, MN 55402, for defendant James Saxon.

Erin M. Verneris and Robert L. Schnell, Jr., **FAEGRE BAKER DANIELS LLP**, 90 South 7th Street, Suite 2200, Minneapolis, MN 55402, for defendants James Saxon and Boston Scientific Corporation.

This case involves a dispute over a sales representative's covenant not to compete with his former employer. Defendant James Saxon sold cardiac rhythm management ("CRM") devices for plaintiff St. Jude Medical, S.C., Inc. ("St. Jude"), but left St. Jude to work for defendant Boston Scientific Corporation ("Boston Scientific"). St. Jude now alleges that Saxon has violated the terms of his covenant not to compete by helping Boston Scientific to sell CRM devices to his former St. Jude customers. St. Jude moves

for a preliminary injunction against both Saxon and Boston Scientific and for expedited discovery. The Court will order a preliminary injunction enjoining Saxon from violating the terms of his covenant not to compete with St. Jude. The Court will not order expedited discovery, but will refer the parties to the Magistrate Judge for an early settlement conference.

## BACKGROUND

## I.    PARTIES AND CRM DEVICES

St. Jude is a Minnesota corporation that develops and manufactures medical devices, including CRM devices and "other devices used to diagnose and treat cardiovascular disease and other disorders." (Notice of Removal, Ex. 1 ("Compl.") ¶ 3, Aug. 26, 2013, Docket No. 1.) CRM devices include pacemakers and implantable cardioverter defibrillators ("ICDs"). (*Id.* ¶ 10.) St. Jude markets and sells CRM devices through an organization of sales representatives who "market, sell and support [St. Jude]'s products in domestic markets throughout the United States and internationally." (*Id.*)

St. Jude alleges that it "expends significant resources on the training and continuing education of its sales personnel to keep them current on the features, capabilities and best uses of its products." (*Id.*) This is because "[e]xperienced and knowledgeable sales personnel are critical in the highly competitive medical device industry because physicians frequently rely on them to describe and explain the features and capabilities of the device and also to provide reliable clinical data and instructions

concerning the use of the device." (*Id.* ¶ 11.)   Additionally, St. Jude alleges that physicians depend on the sales personnel to "train and assist them with the use of the device" and they "often have these personnel observe procedures. . . . As a result, the physicians' confidence and reliance on the competence and expertise of the sales personnel is a significant, often determinative, factor in a physician's decision to purchase and use [St. Jude] products." (*Id.* ¶ 12.)

## II.    SAXON'S EMPLOYMENT WITH ST. JUDE

Saxon joined St. Jude as a sales representative in June 2009.  He was responsible for sales in a territory in and around Montgomery, Alabama.  (*Id.* ¶ 18.)  St. Jude alleges that "[t]hroughout his tenure with [St. Jude], Saxon was highly successful.  He increased sales, enhanced customer loyalty, and established valuable relationships with physicians and purchasing personnel." (*Id.* ¶ 19.)  When he became an employee of St. Jude, Saxon signed an Employment Agreement that included an initial term of three years, after which the terms of the Employment Agreement continued on an "at will" basis.   The Employment Agreement also included a non-compete clause:

> <u>Non-Competition</u>. During Employee's employment and for a period of one (1) year after the date of termination of employment with [St. Jude] for any reason, Employee will not directly or indirectly engage as a consultant, independent contractor, proprietor, stockholder, partner, co-venturer, officer, director, employee, or in any other capacity with any business which designs, manufactures or sells products which compete with products, now or later during Employee's employment, that are designed, manufactured or sold by [St. Jude] or any of its affiliates in the territory assigned to Employee during the last year of Employee's employment. . . . For a period of one (1) year after the date of termination of employment with [St. Jude] for any reason, Employee will not directly or indirectly sell, demonstrate, promote, solicit or support the sale of, support or supervise the

implantation or other use of, or otherwise have any involvement with the sale or use of any product which competes with any products which Employee sold or solicited the sale of during Employee's employment, to or with any customer upon whom Employee called during the last year of Employee's employment.  For a period of one (1) year after the date of termination of employment with [St. Jude] for any reason, Employee will not directly or indirectly influence or attempt to influence such customers to direct their business involving products sold by Employee to any competitor of [St. Jude].

(Compl. ¶ 21, Ex. A ¶ 8.)  Saxon worked for St. Jude for the full three years of his Employment Agreement terms, but terminated his employment with St. Jude and began working for Boston Scientific on or about May 6, 2013.  (Compl. ¶ 20.)

## III.    VIOLATION OF THE NON-COMPETE CLAUSE

St. Jude alleges in its verified complaint that in the months following Saxon's departure from St. Jude he violated the non-compete clause of his Employment Agreement on several occasions.  These allegations are based on the account of Amy Manley, a St. Jude sales representative who worked with Saxon until he resigned.  (*Id.* ¶ 24.)

First, St. Jude alleges that on June 18, 2013, Manley saw Saxon inside a cardiology office whose physicians practice at one of the hospitals to which Saxon formerly sold CRM devices.  (*Id.* ¶ 26.)  Manley stated that she saw Saxon speaking with a nurse there.  (*Id.*; Aff. of Amy Manley ¶ 5, Sept. 13, 2013, Docket No. 17.)  She stated that later that day she "learned that Saxon had been asking the nurse questions and offering to help her with pacing and ICD issues that morning.  He had also been offering

to help with Boston Scientific coding and reimbursement issues, including such issues for pacemakers and ICDs."  (Compl. ¶ 27; Manley Aff. ¶ 6.)

Next, St. Jude alleges that a week later, an email from a Senior Manager for Field Reimbursement at Boston Scientific was sent to members of the cardiology office's staff, carbon-copying Saxon, which discussed and followed-up on Saxon's June 18 meeting at the office.  (Compl. ¶ 28.)  The email stated "I have attached the presentations we discussed . . ." and included a powerpoint presentation entitled "2013 CRM Physician Device Monitoring Codes ALABAMA" and another document entitled "CRM Physician Payment Rate Summary."  (*Id.*; Manley Aff. ¶ 7.)

Two days later, St. Jude notified Boston Scientific in writing of these alleged violations of Saxon's Employment Agreement and demanded that the violations cease immediately.  (Compl. ¶ 29, Ex. B.)

On July 3, 2013, Manley learned that Saxon had again contacted the nurse at the cardiology office to set up a "lead study" with the office.  (*Id.* ¶ 30; Manley Aff. ¶ 8.)  According to St. Jude, "lead studies exclusively concern and examine CRM issues." (Compl. ¶ 30.)  St. Jude alleges that later in the day, Manley was in the nurse's office and overheard both sides of a cell phone conversation between the nurse and Saxon, in which she heard Saxon attempt to set up an appointment for one of his Boston Scientific CRM sales colleagues to train the nurse on one of Boston Scientific's CRM products.  (*Id.* ¶ 31.)  The following week Manley learned that Saxon had directly compared Boston Scientific's lead study to St. Jude's similar study to staff at the cardiology office and that he had visited a purchasing director at a different office with a Boston Scientific sales

partner and proposed an addition to the officer's purchasing agreement which included CRM devices.  (*Id.* ¶¶ 32-33.)

At this point, St. Jude again notified Boston Scientific in writing that it believed Saxon was violating his Employment Agreement.   (*Id.* ¶ 34.)   Boston Scientific responded, denying any violations because Saxon's activities did not involve selling CRM devices.  (*Id.* ¶ 35.)

St. Jude further alleges that Manley learned that Saxon, his manager, and a Boston Scientific executive had taken an electrophysiologist (who practiced at one of the hospitals Saxon worked with while he was at St. Jude) to dinner on July 24, 2013, and discussed CRM products during dinner.  (*Id.* ¶ 39; Manley Aff. ¶ 12.)  Two days later, two surgical procedures on Manley's schedule – an ICD and a biventricular ICD – with a cardiologist who regularly practices at the same hospital as the electrophysiologist with whom Saxon had been to dinner were cancelled and switched to Boston Scientific. (Compl. ¶ 40; Manley Aff. ¶ 13.)   Manley stated that she learned that "Saxon had repeatedly called and demanded to meet with the physician in the physician's office on July 24 or 25," that he and his manager and a Boston Scientific executive had met in the physician's office for about an hour, and that after the meeting the physician directed that the two CRM cases scheduled for July 26 be switched from St. Jude to Boston Scientific. (Compl. ¶ 41; Manley Aff. ¶ 13.)

IV.   **SAXON AND BOSTON SCIENTIFIC'S VERSION OF EVENTS**

Saxon and Boston Scientific do not materially dispute these allegations.  Rather, they claim that on each of the occasions alleged by St. Jude, Saxon was not selling CRM devices, but was assisting the doctors or staff with interventional cardiology ("IC") devices, which St. Jude does not sell.  They explain the difference between CRM devices and IC devices as follows:

> CRM products include pacemakers, implantable cardioverter defibrillators (commonly called "ICDs"), and cardiac resynchronization therapy defibrillators (commonly called "CRT-Ds"). . . . The primary customers for CRM devices are electrophysiologists, who are physicians specializing in the diagnosis and treatment of the electrical problems in the heart.

> IC products and technologies, on the other hand, are designed to diagnose and/or treat cardiovascular disease . . . .  IC products provide minimally-invasive treatment options, including the use of coronary balloons, guide wires, and stents. . . .  The primary customers for IC devices are interventional cardiologists, who specialize in catheter-based treatment of arterial heart disease.

(Response to Mot. for Prelim. Inj. and Expedited Disc. at 2-3, Oct. 4, 2013, Docket No. 29 (citing Decl. of James DeJuneas ¶¶ 5-9, Oct. 4, 2013, Docket No. 30)).)

With regard to the June 18 visit, defendants argue that the focus of Saxon's visit was to learn from a presentation on new reimbursement codes for IC and that he did speak to a nurse that morning who had questions about CRM devices, but that he told the nurse about the non-compete agreement and said a Boston Scientific manager could answer them.  (*Id.* at 5 (citing Decl. of James Saxon ¶¶ 14-16, Oct. 4, 2013, Docket No. 31).)  Similarly, Saxon claims that he spoke to a nurse about a lead study, but he told her that someone else from Boston Scientific would contact her about the study.  (Saxon

Decl. ¶ 15.)  With regard to the Boston Scientific Senior Manager's email, Saxon claims that he was copied on the email because he was learning about reimbursement for IC. (*Id.*)  With regard to the July 3 phone call with the nurse, Saxon claims that the nurse wanted to sign up a patient with Boston Scientific, but Saxon informed the nurse he could not do so because of the non-compete and told her he would put her in contact with someone else at Boston Scientific.  (*Id.* ¶ 17.)  He claims that on July 8, he did call a cardiology office to cancel an appointment for one of his colleagues, and told the nurse that another of his colleagues would be in touch.  (*Id.* ¶ 18.)  He denies that he visited a purchasing director at a different office on July 8 with his sales partner and instead claims that the only time he visited that office was to talk to a physician about stents and that another Boston Scientific sales representative accompanied him.  (*Id.* ¶ 19.)

Saxon also does not deny the dinner with an electrophysiologist on July 24, 2013, but claims that:

> The purpose of the dinner was to talk to the doctor about emergent technology, including interventional-cardiology products.  Some questions about CRM came up in the conversation, but a Boston Scientific CRM representative was there to field those questions.

(*Id.* ¶ 20.)  Similarly, he does not deny the conversation with a doctor on July 25, but claims that they "discussed the future of interventional cardiology and CRM."  (*Id.* ¶ 21.)

## V.   PROCEEDINGS

St. Jude sued Saxon and Boston Scientific in Ramsey County district court, alleging breach of the Employment Agreement against Saxon, tortious interference with a contract against Boston Scientific, and seeking unjust enrichment or a constructive trust.

(Compl. at 11-13.)  The defendants removed to federal court and St. Jude now moves for a preliminary injunction against both defendants and for expedited discovery. (Mot. for Prelim. Inj. and Expedited Disc., Sept. 13, 2013, Docket No. 14.)

## DISCUSSION

## I.   STANDARD OF REVIEW

The Court considers four factors in determining whether to grant preliminary injunctive relief: (1) the probability that the moving party will succeed on the merits; (2) the threat of irreparable harm to the moving party; (3) the balance of harms as between the parties; and (4) the public interest.  *S.J.W. ex rel. Wilson v. Lee's Summit R7 Sch. Dist.*, 696 F.3d 771, 776 (8th Cir. 2012) (citing *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)).  "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined."  *Dataphase*, 640 F.2d at 113. The burden of establishing the propriety of an injunction is on the movant.  *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

## II.   PRELIMINARY INJUNCTION AGAINST SAXON

St. Jude requests that the Court enjoin Saxon from:

> directly or indirectly selling, demonstrating, promoting, soliciting or supporting the sale of, supporting or supervising the implantation or other use of, or otherwise having any involvement with the sale or use of any Boston Scientific or other competitive product to any customer to whom/which he sold or solicited CRM products in the last year of his [St. Jude] employment, including without limitation the following hospitals and physician practice groups [listing groups/hospitals].

(Mot. for Prelim. Inj. & Expedited Disc. ¶ 1.)

Saxon argues that he has not violated the Employment Agreement because, on each relevant occasion he was not actually selling CRM devices, but rather was only engaged in selling IC devices, which are not subject to his Employment Agreement. St. Jude argues in return that, even if he was not directly selling CRM devices, his activity surrounding IC devices was "in support" of the sale of CRM devices by his colleagues, and such "indirect" conduct is still prohibited by the Employment Agreement.

### A.      Likelihood of Success on the Merits

On the first factor of the preliminary injunction test, the court in *Dataphase* "rejected the notion that the party seeking relief must show 'a greater than fifty per cent likelihood that he will prevail on the merits,' holding instead that 'where the balance of other factors tips decidedly toward plaintiff a preliminary injunction may issue if movant has raised questions so serious and difficult as to call for more deliberate investigation.'" *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 731 (8th Cir. 2008) (citing *Dataphase*, 640 F.2d at 113).  Thus, the Eighth Circuit has instructed district courts considering this factor to query whether the moving party has a "fair chance of prevailing." *Id.* at 732.

The Court must determine whether St. Jude has shown that it has a fair chance of prevailing on its claim against Saxon for breach of the Employment Agreement.  The parties do not dispute that Minnesota law governs this contract dispute, and Saxon does

not argue that the Employment Agreement at issue is unenforceable.[1]  "Under Minnesota law, employment noncompete agreements are generally disfavored," *Boston Scientific Corp. v. Duberg*, 754 F. Supp. 2d 1033, 1039 (D. Minn. 2010), and should be "strictly construed," *Medtronic, Inc. v. Gibbons*, 684 F.2d 565, 568 (8th Cir. 1982) (applying Minnesota law).  *See also Haynes v. Monson*, 224 N.W.2d 482, 483 (Minn. 1974).

The Employment Agreement here prohibits Saxon from "directly or indirectly sell[ing], demonstrat[ing], promot[ing], solicit[ing] or support[ing] the sale of, support[ing] or supervis[ing] the implantation or other use of, or otherwise hav[ing] any involvement with the sale or use of any product which competes with any products [made by St. Jude]."  (Compl. ¶ 21, Ex. A ¶ 8.)  Under either Saxon's or St. Jude's versions of the events, Saxon's interactions with his former customers could be construed as indirectly supporting the sale of CRM devices.[2]  Dinner with an electrophysiologist

---

[1]  Even if he did, the Court would likely find that the Employment Agreement is enforceable.  In *Boston Scientific Corp. v. Duberg*, 754 F. Supp. 2d 1033, 1039 (D. Minn. 2010), the court found a very similar agreement to be enforceable.  It noted that "[c]ourts have repeatedly recognized that noncompete agreements in the medical device industry serve employers' important and legitimate interests in long-term customer relationships and preserving goodwill."  *Id.* at 1039 (citing *Guidant Sales Corp. v. Niebur*, Civ. No. 01–1772, 2001 WL 1636502, at *7 (D. Minn. Oct. 18, 2001)); *see also Guidant Sales Corp. v. Baer*, Civ. No. 09–0358, 2009 WL 490052, at *4 (D. Minn. Feb. 26, 2009) (noting that "[c]ourts have consistently found one-year restrictions that are limited to a former employee's sales area to be reasonable").  The court in *Duberg* noted that "the noncompete in this case is even more narrowly drawn because it applies only to customers with whom [Duberg] had sales-related contacts in the year preceding the termination of [her] employment.  Duberg's noncompete is entirely reasonable in both temporal and geographic scope."  *Duberg*, 754 F. Supp. 2d at 1039 (internal quotation marks omitted).

[2]  The Court may consider the allegations in St. Jude's verified complaint as evidence for the purposes of this preliminary injunction motion.  *See* 43A C.J.S. Injunctions § 327 ("[T]he showing of facts necessary to justify a preliminary injunction may be made by pleadings, and

(Footnote continued on next page.)

(which is a doctor who uses CRM devices, rather than IC devices) was likely in support of sales of CRM devices, regardless of whether Saxon himself answered any questions about CRM products during the dinner.   At oral argument counsel for Saxon acknowledged that if CRM products come up during a discussion, he should leave the room rather than simply not answer questions.   Similarly, Saxon admits that during the hour-long meeting with a physician on July 25, they discussed "the future of interventional cardiology and CRM," (Saxon Aff. ¶ 21), not simply interventional cardiology.

These interactions likely served to "support" the sales of CRM devices either directly or indirectly, because Saxon appears to have utilized the contacts he developed during his time with St. Jude to create opportunities for Boston Scientific to sell CRM devices.   In *Boston Scientific Corp. v. Duberg*, 754 F. Supp. 2d 1033, 1039-40 (D. Minn. 2010), a CRM sales representative subject to a non-compete agreement with language similar to Saxon's also sold a device to former customers which she claimed was not a CRM device (and rather, was an insertable loop recorder ("ILR")).   The court found that her former employer was likely to succeed on its breach of contract claim, noting that

---

(Footnote continued.)

where the pleadings are properly verified, they may serve both as pleadings and evidence on an application for a temporary injunction." (footnote omitted)).   Although Saxon's account differs slightly from that of St. Jude, the Court does not deem those differences material to the disposition of this motion.   *Cf. Chicago, B. & Q.R. Co. v. Chicago Great W. Ry. Co.*, 190 F.2d 361, 363 (8th Cir. 1951) ("[The preliminary injunction] was heard wholly on the verified complaint, affidavits and exhibits.   On material questions the affidavits were conflicting but because of our views as to the applicable law we do not deem it important to attempt a statement of the evidence and the various claims of the parties in detail.").

"even if Duberg is only visiting her old accounts to directly sell and support the ILR (which she acknowledges she is doing)," her "continued contact with the same hospitals and cardiologists, including selling ILRs to them, is likely 'supporting the sale of' and indirectly helping to market Medtronic CRMs – actions her noncompete agreement also prohibits." *Id.* at 1040.  Counsel for Boston Scientific asserted at oral argument that the ILRs in *Duberg* are much closer in function to CRM devices than IC products are, such that Duberg's sales of ILRs was a clearer infringement of her non-compete agreement than Saxon's sales of IC products.  Nevertheless, the case is instructive with regard to the extent to which contact with former customers that leads to the sale of restricted devices can be found to support the sale of those devices.  *See also Guidant Sales Corp. v. Niebur*, Civ. No. 01-1772, 2001 WL 1636502, at *7 (D. Minn. Oct. 18, 2001)  ("At minimum, there is evidence that both Niebur and Sawyer indirectly promoted St. Jude CRM devices by facilitating the presence of St. Jude representatives at implants and clinics which had previously been exclusively serviced by Guidant representatives. Moreover, even if Niebur and Sawyer are only responsible for selling non-CRM devices for St. Jude, their continued contact with their former Guidant CRM customers inevitably facilitates the promotion and sale of St. Jude CRM devices.").  Thus, even construing the Employment Agreement narrowly, Saxon's activities connecting his former customers to Boston Scientific CRM sales would likely fall under "support" of the sale of CRM devices.

This is especially the case given St. Jude's assertion that Saxon's actions led one hospital to switch two devices from St. Jude devices to Boston Scientific devices at the

last minute, shortly after one of Saxon's conversations with the physician at the hospital. (Manley Aff. ¶ 13.)  *Cf. Boston Scientific Corp. v. Kean*, Civ. No. 11-419, 2011 WL 853644, at *9 (D. Minn. Mar. 9, 2011) (finding plaintiff-former employer likely to succeed on breach of non-compete agreement based on incident that was "[m]ost troubling to the Court" in which employee subject to non-compete agreement caused physician to switch to new employer's device and was present at the operation). The Court therefore concludes that St. Jude has demonstrated a likelihood of success with its claim against Saxon for breach of the Employment Agreement.

### B.   Irreparable Harm

"To succeed in demonstrating a threat of irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Roudachevski v. All-Am. Care Centers, Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (internal quotations omitted).  "Minnesota courts have consistently held that '[i]rreparable harm may be inferred from breach of a valid non-compete agreement if the former employee obtained a personal hold on the good will of the former employer.'" *Duberg*, 754 F. Supp. 2d at 1041 (citing *St. Jude Med. S.C., Inc. v. Ord*, Civ No. 09-738, 2009 WL 973275 (D. Minn. Apr. 10, 2009)).  This is because loss of reputation or consumer good will is often considered to amount to irreparable harm.  *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003) (loss of intangible assets such as reputation and goodwill constitute irreparable injury); *Iowa Utils. Bd. v.*

*Fed. Commc'ns Comm'n*, 109 F.3d 418, 426 (8th Cir. 1996) (loss of consumer goodwill can be irreparable harm).

St. Jude alleges that Saxon utilized the good will he benefited from during his employment with St. Jude on behalf of Boston Scientific.  As St. Jude explains, "[e]xperienced and knowledgeable sales personnel are critical in the highly competitive medical device industry" and "physicians' confidence and reliance on the competence and expertise of the sales personnel is a significant, often determinative, factor in a physician's decision to purchase and use [St. Jude] products."  (Compl. ¶¶ 11-12.)  The Court is satisfied that this demonstrates that St. Jude will suffer irreparable harm if Saxon's activities continue.  *Cf. Kean*, 2011 WL 853644, at *11 (finding irreparable harm where plaintiff argued that "clientele for its medical devices is highly sophisticated, requiring representatives to have deep sales, technical, and clinical knowledge in order to successfully market and sell the company's devices" and "[l]ong-term customer relationships are crucial to the success of a sales representative and the company whose products he sells"); *Ord*, 2009 WL 973275, at *5 ("[A]s a result of his work with St. Jude, [the defendant] is the beneficiary of the good will of St. Jude's customers and . . . St. Jude faces irreparable harm from continued non-compete violations by Ord.").

### C.      Balance of Harms

The balance of harms here weighs in favor of granting preliminary injunctive relief.  Even with a preliminary injunction in place, Saxon and Boston Scientific can continue to benefit from Saxon's work that falls outside the scope of his covenant not to

compete, including selling CRM devices to those customers he did not sell to while in his last year with St. Jude.  After the end of the term of the one-year non-compete covenant, he can resume selling to his St. Jude contacts.  In contrast, St. Jude suffers a clear, irreparable harm in its loss of customer goodwill during the course of Saxon's one-year agreement.  *Cf. Duberg*, 754 F. Supp. 2d at 1041 ("The possibility of harm to Duberg if preliminary injunctive relief is granted is minimal compared to the irreparable harm Boston Scientific faces [as] Duberg may still sell CRM and ILR devices to doctors and hospitals that are outside her restricted accounts.  Although not selling ILRs to her old clients may result in a less successful year in sales than she would otherwise have, she will still be able to generate income."); *see also Kean*, 2011 WL 853644, at *11.

### D.    Public Interest

"'[T]he public interest favors the enforcement of valid business agreements and the protection of legitimate business interests in an industry propelled by vigorous but fair competition.'"  *See Duberg*, 754 F. Supp. 2d at 1042 (quoting *Niebur*, 2001 WL 1636502, at *8); *Ord*, 2009 WL 973275, at *6 ("[T]he public interest is served by upholding parties' contractual obligations, and Minnesota law permits use of non-compete agreements to protect an employer's good will." (citing *N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 (8th Cir. 1984); *Alside, Inc. v. Larson*, 220 N.W.2d 274, 280 (Minn. 1974))).  The public interest favors enforcement of the narrowly-drawn Employment Agreement here.  Because St. Jude has met its burden of establishing the four *Dataphase* factors, the Court concludes that preliminary injunctive relief is appropriate.

**E.       Scope of the Injunction**

At oral argument, the parties agreed generally that a preliminary injunction would be appropriate, but disputed the scope of any such injunction.  St. Jude argues that any preliminary injunction should prohibit Saxon from selling IC devices and products, not merely CRM devices, because his prior actions proved that he could not sell IC devices without violating the terms of the Employment Agreement.  Saxon and Boston Scientific argue that any preliminary injunction should be limited to enforce only the terms of the Employment Agreement.  The Court declines to order preliminary injunctive relief broader than the scope of the Employment Agreement itself.  Although the Court concludes that several of Saxon's interactions with his former customers likely violated the terms of the Employment Agreement, the Court sees no basis for determining that St. Jude could succeed in showing that the sale of IC devices alone – without bringing in Boston Scientific CRM sales people or discussing CRM devices in any way – violates the Employment Agreement.  The Court will therefore issue a preliminary injunction enjoining Saxon only from violating the terms of the Employment Agreement.  If Saxon is undeterred by this order and continues engaging in activities prohibited by the Employment Agreement, such a violation of the preliminary injunction order will result in sanctions.

**F.       Security Requirement**

Federal Rule of Civil Procedure 65 provides that a preliminary injunction shall issue only if the applicant "gives security in an amount that the court considers proper to

pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Saxon has not addressed this issue, and has not "attempted to quantify any dollar amount of harm that [he] may face from a wrongly issued injunction." *See Northshor Experience, Inc. v. City of Duluth, Minn.*, 442 F. Supp. 2d 713 (D. Minn. 2006). In the absence of a request for a security or any evidence establishing an approximation of the monetary harms Saxon would suffer due to a wrongly issued injunction, the Court will waive the security requirement in this case. *See Tau, Inc. v. Alpha Omicron Pi Fraternity, Inc.*, Civ. No. 12-3141, 2013 WL 5340904, at *16 (D. Minn. Sept. 23, 2013).

## III.    PRELIMINARY INJUNCTION AGAINST BOSTON SCIENTIFIC

St. Jude also seeks preliminary injunctive relief against Boston Scientific, enjoining it "from continuing the employment of Saxon in violation of his [St. Jude] Employment Agreement (attached to the Verified Complaint as Exhibit A) and from permitting Saxon to breach any part of the Court's order regarding the same." (Mot. for Prelim. Inj. & Expedited Disc. ¶ 2.) The Court will decline to enter a preliminary injunction against Boston Scientific at this time because, in light of the Court's preliminary injunction against Saxon, the risk of irreparable harm to St. Jude by Boston Scientific is low and the balance of harms do not favor enjoining Boston Scientific.

### A.    Irreparable Harm

Even if St. Jude were likely to succeed on the merits of its claim that Boston Scientific tortuously interfered with the Employment Agreement, the Court finds that the

risk of St. Jude suffering irreparable harm in the absence of an injunction against Boston Scientific is low.  Any such harm to St. Jude will likely be prevented by the preliminary injunction against Saxon.  *Cf. Benfield, Inc. v. Moline*, 351 F. Supp. 2d 911, 920 (D. Minn. 2004) ("[T]he possibility of irreparable harm stemming from breach of the restrictive covenants is adequately addressed without enjoining [new employer], particularly when there is little evidence that [new employer] has committed any legal wrong.").  Counsel for Boston Scientific asserted at oral argument that it is 'perfectly willing to live' with an injunctive order requiring Saxon to comply with the terms of his Employment Agreement, which it understands to prohibit him discussing CRM, promoting the sale of CRM devices, or otherwise assisting with the sale of CRM devices. This assurance, combined with the order enjoining Saxon, minimizes any risk of irreparable harm to St. Jude that could stem from the actions of Boston Scientific.  *See Superior Edge, Inc. v. Monsanto Co.*, Civ. No. 12-2672, 2013 WL 4050790, at *20 (D. Minn. Aug. 9, 2013) ("Because of Monsanto's clear and unequivocal promise not to seek arbitration, the only harm SEI alleges is unlikely and speculative, and therefore fails to meet the standard of irreparable harm required for the entry of an injunction."); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").

**B.    Balance of Harms**

A finding of no irreparable harm is alone enough reason to decline to enter the preliminary injunction against Boston Scientific.  *See Dataphase*, 640 F.2d at 114 n.9 ("[T]he absence of a finding of irreparable injury is alone sufficient ground for vacating the preliminary injunction,").   But the balance of harms here also weighs against enjoining Boston Scientific.  Based on counsel for Boston Scientific's representations at oral argument, the Court is satisfied that Boston Scientific will adequately monitor Saxon to ensure there are no further violations of his Employment Agreement with St. Jude. Therefore, holding Boston Scientific responsible for Saxon's actions under Court order by entering a preliminary injunction against Boston Scientific would unduly burden Boston Scientific with the threat of sanction for **Saxon's** behavior and is not warranted at this time in light of the injunction against Saxon.  Thus, the balance of harms factor also counsels against enjoining Boston Scientific.   Certainly, if further violations of the Employment Agreement occur, Boston Scientific may face additional liability or further action by the Court.

**IV.    MOTION FOR EXPEDITED DISCOVERY**

St. Jude also requests expedited discovery under Federal Rules of Civil Procedure 30, 33, and 34.  It seeks this relief in order "to detect the extent to which Saxon has violated, and continues to violate, the non-compete provision in his Employment Agreement and take action to reduce the resulting harm."  (Mem. in Supp. of Mot. for Prelim. Inj. and Expedited Disc. at 28, Sept. 13, 2013, Docket No. 15.)  Defendants

oppose the request, arguing that St. Jude has identified no improper conduct by Saxon in the time period since St. Jude filed this lawsuit and arguing that defendants have demonstrated their willingness to stipulate to an injunction enforcing the terms of the Employment Agreement.  Instead, defendants suggest that the Court order an early settlement conference.

The Court finds that, in light of the preliminary injunction against Saxon, expedited discovery is not necessary at this time.  The parties can proceed with discovery on a normal timeline, and in the meantime Saxon is prohibited from supporting the sale of CRM devices to his former customers.  Based on defendants' suggestion that a settlement conference could be fruitful at this time, the Court will refer the parties to the Magistrate Judge for an early settlement conference.

## ORDER

Based on the foregoing, and the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that plaintiff's motion for preliminary injunction and expedited discovery [Docket No. 14] is **GRANTED in part** and **DENIED in part** as follows:

1.      The motion for expedited discovery is **DENIED**.

2.      From the date of this injunction through May 5, 2014, defendant James Saxon is enjoined from violating the terms of the non-compete covenant found in Section 8 of his Employment Agreement with St. Jude:

a.      Saxon is enjoined from directly or indirectly selling, demonstrating, promoting, soliciting or supporting the sale of, supporting or supervising the

implantation or other use of, or otherwise having any involvement with the sale or use of any product which competes with any products which Saxon sold or solicited the sale of during his employment with St. Jude to any customer to whom/which he sold or solicited CRM products in the last year of his St. Jude employment, including without limitation, the following hospitals and physician practice groups:

| Name of Physician Practice Group / Hospital | Location | Individual Physicians |
|---|---|---|
| Advanced Cardiovascular Auburn | Alexander City, Alabama<br>Dadeville, Alabama<br>Valley, Alabama | Dr. Brian Foley<br>Dr. Ivan Slavich<br>Dr. Ross Davis |
| Auburn Cardiovascular | Auburn, Alabama | Dr. Michael Williams<br>Dr. Donald Rhodes<br>Dr. Seligman |
| East Alabama Heart and Vascular | Auburn, Alabama<br>Dadeville, Alabama<br>Wedowee, Alabama | Dr. Kevin Ryan<br>Dr. David Holmes<br>Dr. Allan Schwadron |
| Heart Center | Auburn, Alabama | Dr. John Mitchell |
| Opelika Cardiovascular | Opelika, Alabama<br>Dadeville, Alabama<br>Roanoke, Alabama | Dr. Michael Aikens<br>Dr. Scott Westermeyer |
| Valley Cardiology | Valley, Alabama | Dr. Kris Reddy |
| Advanced Cardiovascular | Alexander City, Alabama | |
| Cardiology of Central Alabama | Alexander City, Alabama | |
| Cardiology Associates | Montgomery, Alabama | Dr. John Williams<br>Dr. Howard Brazil<br>Dr. Charles Hastey |
| River Region Cardiology | Montgomery, Alabama | Dr. Pervaiz Malik<br>Dr. N. Bhalla<br>Dr. Luqman Ahmed |
| Southeastern Cardiology | Montgomery, Alabama | Dr. Thomas Wool<br>Dr. Scott Sims<br>Dr. Patel |
| Montgomery Cardiovascular | Montgomery, Alabama | Dr. Wynne Crawford<br>Dr. Tamjeed Arshad<br>Dr. Jose Escobar<br>Dr. John Jennings |
| Jackson Hospital | Montgomery, Alabama | Dr. Stephen Kwan |

| | | |
|---|---|---|
| Baptist South | Montgomery, Alabama | |
| Baptist East | Montgomery, Alabama | |
| Jackson Hospital | Montgomery, Alabama | |
| Vaughn Regional | Selma, Alabama | |
| East Alabama Medical Center | Opelika, Alabama | |
| Lanier Health Services | Valley, Alabama | |
| Lake Martin Hospital | Dadeville, Alabama | |
| Russell Hospital | Alexander City, Alabama | |

b.     Activities prohibited under Saxon's Employment Agreement include, but are not limited to: introducing other Boston Scientific CRM sales personnel or other representatives to the customers listed in paragraph 2; scheduling, cancelling, or coordinating CRM meetings or events on behalf of Boston Scientific personnel; discussing CRM with the customers listed in paragraph 2 under any circumstance; and attending meetings or events with those customers where CRM is or will be discussed; and

c.   Any violation of this preliminary injunction will result in sanctions.

3.     Plaintiff is not required to provide security in seeking injunctive relief pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

4.     The Magistrate Judge will be in contact with the parties to schedule an early settlement conference.

DATED:  December 10, 2013        _____s/ John H. Tunheim_____
at Minneapolis, Minnesota.                    JOHN R. TUNHEIM
                                     United States District Judge